# EXHIBIT A

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

SHAKINA ORTEGA, individually, and
as successor of interest of VICTOR
ORTEGA, deceased; TAMIA ORTEGA, a
minor, by and through her guardian
Shakina Ortega, and JACOB ORTEGA, a
minor, by and through his guardian
Shakina Ortega,

**CERTIFIED ORIGINAL**

Plaintiffs,

vs.

Case No.
13-CV-0087-LAB-JMA

SAN DIEGO POLICE DEPARTMENT, a
public entity; JONATHAN MCCARTHY,
an individual; CITY OF SAN DIEGO,
a public entity; and DOES 1
through 10,

Defendants.

———————————————————

VIDEOTAPED DEPOSITION OF JONATHAN McCARTHY

Volume I

February 11, 2014

10:08 a.m.

1230 Columbia Street, Suite 400

San Diego, California

REPORTED BY:
Renee K. Papierniak
CSR No. 7056

1

1      A.   Correct.

2      Q.   What information did you have about the initial

3 call?

4          MR. PHILLIPS:  Same thing.  What you can recall

5 here today.

6          THE WITNESS:  From what the reporting party

7 called in, when she called 911, she said her husband had

8 hit her and she was bleeding from the mouth, and she was

9 requesting medics.

10 BY MS. DENNING:

11     Q.   That information was communicated to you through

12 the dispatcher.  Correct?

13     A.   Yes.

14     Q.   You didn't hear the 911 call.  Correct?

15     A.   Correct.

16     Q.   Anything else that you had in terms of

17 information about either the incident or Mr. Ortega?

18          MR. PHILLIPS:  Vague as to time because I know

19 there was more communications with Maynard later.  So

20 whatever you can recall.

21          THE WITNESS:  At the time, he was a fleeing

22 felon.  If he did in fact hit or kick her wife and she

23 was bleeding, that's a felony.  At the time he was

24 running away from me, I didn't know anything about him

25 except that he was a fleeing felon.

30

Jonathan McCarthy, Volume I
February 11, 2014

1       Q.  Did he say anything else at that point?

2       A.  I don't recall.

3       Q.  And where -- did you have your arms around his

4 upper body, middle body, lower body?

5       A.  Probably around his middle body.

6       Q.  And after he said "Get off me," what did you

7 do?

8       A.  I gave him verbal instructions to "Get on the

9 ground" or "Get down," and he continued to resist.

10      Q.  Okay.  Was he trying to get away?

11      A.  Maybe.

12      Q.  Is that what you thought at the time, that he

13 was trying to get away?

14      A.  At the time when we were actually physically

15 fighting each other, he was trying to fight with me.

16      Q.  When you say "physically fighting each other,"

17 did he ever take a swing at you?

18      A.  No.

19      Q.  Did he ever shove you?

20      A.  Yes.

21      Q.  And can you describe -- at what point did he

22 shove you?

23      A.  We shoved each other multiple times during

24 this -- during the fight.

25      Q.  Was he trying to get you off of him?

32

Jonathan McCarthy, Volume I
February 11, 2014

1          A.   Yes, I believe so.

2          Q.   And you said "multiple times" you shoved each

3     other.  Can you explain that?

4          A.   Using his body weight, shoving me against the

5     wall, myself trying to get him on the ground.  We were

6     bouncing back and forth on each side of the wall of the

7     carport.

8          Q.   And was he saying anything at this point?

9          A.   All I remember was "Get off me."  That's all I

10    remember at that point.

11         Q.   Okay.  So you were bouncing off of the walls.

12    This was of the corridor?

13         A.   Yes.

14         Q.   Can you describe the corridor, the dimensions of

15    it?

16         A.   Not exactly, but it was long and narrow.  The

17    wall is high.

18         Q.   Do you recall approximately how wide that the

19    corridor was?

20         A.   Maybe four feet.

21         Q.   Cement on the bottom?

22         A.   Some cement and some wood.

23         Q.   The ground -- did the ground have wood on it as

24    well?

25         A.   The ground was cement.  I'm sorry, the walls

                                                          33

Jonathan McCarthy, Volume I
February 11, 2014

1    were partially cement, and then there was some wood slats

2    as well.

3         Q.   Okay.  Thank you.  So after you were bouncing

4    off of the walls, what happened next?

5         A.   Well, at that point, I realized he's not

6    complying, he's not going to go to the ground on his own,

7    so I used one of my legs and pulled him over my leg to

8    get him to the ground.

9         Q.   Can you explain how you did that?

10        A.   I just put one of my legs behind his and used

11   both of our body weights to take him to the ground, kind

12   of like tripping.

13        Q.   What leg did you use?

14        A.   I believe it was my left leg.

15        Q.   And you carried at that time a secondary weapon.

16   Is that correct?

17        A.   Yes.

18        Q.   What kind?

19        A.   It was a revolver.

20        Q.   And you had a holster for that.  Is that

21   correct?

22        A.   Yes.

23        Q.   And what kind of holster?

24        A.   I don't recall the manufacturer.  It's an ankle

25   holster.

34

Jonathan McCarthy, Volume I
February 11, 2014

1      Q.   And did you carry that on your right or left

2   leg?

3      A.   Left leg.

4           MR. PHILLIPS:   Ankle.

5           THE WITNESS:   I'm sorry.   Left ankle.

6   BY MS. DENNING:

7      Q.   Okay.   So after you tripped him, what

8   happened?

9      A.   We both fell to the ground, I kind of fell on

10  top of him, and he was -- I was telling him to stop

11  moving.

12     Q.   And what did he do?

13     A.   He continued to lock up his arms underneath his

14  body and continued moving around, not complying.

15     Q.   Did he say anything at that point?

16     A.   Yeah.   He told me he was going to sue me, and he

17  kept saying, "Get off me."

18     Q.   And at this point, was he trying to get away

19  from you?

20     A.   He was just -- he was struggling to fight off my

21  arrest attempt.

22     Q.   At that point, did you have -- strike that.

23          You knew where he lived.   Correct?

24          MR. PHILLIPS:   Objection.   Calls for

25  speculation, lacks foundation.   If you know, you can

35

**Jonathan McCarthy, Volume I**
**February 11, 2014**

1      Q.   And at that point, when you noticed your

2    revolver, both of Mr. Ortega's hands were underneath his

3    body.  Is that correct?

4      A.   I believe so.

5      Q.   What did you do next after you noticed the

6    revolver?

7      A.   At that point, I put my Taser away, I believe,

8    and was able to get one of his arms free.

9      Q.   Why didn't you tase him?

10      A.   At that point, I was just trying to get him

11    controlled.  I saw the weapon there.  Sometimes Tasers

12    don't work.  And if I have that in my hand, and he grabs

13    that weapon, then I have a Taser against a gun.

14      Q.   So when you put your Taser away, did you have

15    anything in your left hand?

16      A.   His arm.

17      Q.   Which arm?

18      A.   His left arm.

19      Q.   And the secondary weapon, was that on --

20    directly in front of Mr. Ortega, to his left, to his

21    right?

22      A.   It was to his right.

23      Q.   And when you put your Taser away, did you put it

24    away with your right hand?

25      A.   Yes.

38

**Jonathan McCarthy, Volume I**
**February 11, 2014**

1    Q.   And what did you do next?

2    A.   I believe at that point I was able to use that

3    free -- my right hand, and gather his other arm, and I

4    was trying to put him in handcuffs.

5    Q.   Okay.  So at this point, you have both of his

6    hands.  Is that correct?

7    A.   Yes.

8    Q.   Are they behind his back?

9    A.   In the process of getting them behind his

10   back.

11   Q.   And where are your handcuffs?

12   A.   On my belt.

13   Q.   And so what happened next after you had both of

14   his hands behind his back?

15   A.   Once I got both hands behind his back, then I

16   pulled out my handcuffs.

17   Q.   Okay.  And did you pull your handcuffs out with

18   what hand?

19   A.   My right hand.

20   Q.   And what were you doing with your left hand?

21   A.   Holding his hands.

22   Q.   Both hands?

23   A.   Trying to.

24   Q.   Okay.  What happened next?

25   A.   I was able to place the handcuff on his left --

39

1       around his wrist.

2              Q.   Okay.  And at that point, what did he do?

3              A.   At that point, he pulled his right hand -- his

4       right hand free and reached forward and went to grab my

5       revolver.

6              Q.   And what direction were you looking at when that

7       occurred?

8              A.   At his hand.

9              Q.   And what did you do?

10             A.   I immediately reached out up with my right hand

11      to try to block his attempt to grab my revolver.

12             Q.   Were you successful in doing that?

13             A.   Yes.

14             Q.   And so did your right hand make contact with his

15      hand?

16             A.   His arm area.

17             Q.   Okay.  And were you able to pull his arm back

18      down?

19             A.   I just pushed it.  I wasn't able to pull it back

20      down.

21             Q.   You pushed it in which direction?

22             A.   Probably -- well, I would say to the left.  That

23      would be the natural motion.

24             Q.   Okay.

25             A.   While -- I'm sorry -- while his arm is extended,

                                                                    40

Jonathan McCarthy, Volume I
February 11, 2014

1        pushing it to the left.

2              Q.  Was it fully extended, his right arm?

3              A.  Yes.

4              Q.  Do you know if Victor Ortega saw the gun before

5        he reached in that direction?

6              MR. PHILLIPS:  Objection.  Calls for

7        speculation, lacks foundation.  If you know.

8              THE WITNESS:  At that point, I was hoping he

9        didn't, but I didn't actually see him look at it.  The

10       whole time, I was hoping he did not see it.

11       BY MS. DENNING:

12             Q.  When you say he tried to grab at the gun, how do

13       you know that he was trying to grab at the gun?

14             A.  His hand went directly at it, and his hand

15       touched it.

16             Q.  But you're not sure if he knew it was there?

17             A.  At that point, I knew he knew it was there.

18             Q.  How?

19             A.  He was reaching for it.

20             Q.  How do you know that he just wasn't trying to

21       get up and away?

22             A.  Because his hand went directly to the

23       revolver.

24             Q.  Which was a foot in front of his head.

25       Correct?

                                                              41

1          A.   Approximately.

2              MR. PHILLIPS:   Well, objection, that

3    mischaracterizes his prior testimony.   He said a foot or

4    two.

5    BY MS. DENNING:

6          Q.   Okay.   Approximately a foot or two?

7          A.   Correct.

8          Q.   And so what did you do after you were able to

9    push his hand -- his right hand away?

10         A.   Well, at that point, I pulled myself off him to

11   push the revolver further away.

12         Q.   And what did you use to push it further away?

13         A.   That same right hand.

14         Q.   How far were you able to push it?

15         A.   I don't know.   I just know I pushed it.   It

16   could have been a foot, maybe two feet.

17         Q.   Okay.   At this point, when you pushed the

18   secondary weapon away, can you describe what Victor

19   Ortega was doing with his right hand?

20         A.   No.

21         Q.   Did you have to get off of Victor Ortega in

22   order to push the gun away?

23         A.   Yes.

24         Q.   Did you stand fully upright?

25         A.   No.

                                                            42

Jonathan McCarthy, Volume I
February 11, 2014

1  Q. Were you --- did you have a knee on the ground or

2  two knees on the ground?

3  A. One or both.

4  Q. Did you let go of Victor Ortega's left hand at

5  that point?

6  A. Yes.

7  Q. So you freed up both hands in order to push the

8  secondary weapon away. Is that correct?

9  A. Yes.

10  Q. And you pushed the secondary weapon with your

11  right hand?

12  A. Yes.

13  Q. And what were you doing with your left hand at

14  that point?

15  A. My left hand was free.

16  Q. And you don't know what Victor Ortega was doing

17  at that point?

18  A. At that very half a second, no.

19  Q. After you pushed the gun away, what happened

20  next?

21  A. After that, I'm thinking in my head, now he is

22  trying to kill me. So I pulled my pistol off my belt and

23  started to turn my body back towards Victor Ortega.

24  Q. How far were you away from Victor Ortega when

25  you pulled your pistol out?

43

Jonathan McCarthy, Volume I
February 11, 2014

1      A.  A couple of feet.

2      Q.  Were you closer to the parking lot or closer to

3  the gate and the corridor?

4      A.  The parking lot.

5      Q.  And Victor -- where was his head at the time

6  that you began to pull your pistol out?

7      A.  Well, his body was getting up and coming at

8  me.

9      Q.  Was he coming up from laying down on his stomach

10  position?

11      A.  Yes.

12      Q.  And did you pull your pistol out with your right

13  or your left hand?

14      A.  My right hand.

15      Q.  What were you doing at the time that you pulled

16  your pistol out?

17      A.  I was turning my body around to face him, to see

18  what he was doing.

19      Q.  And was your right foot or your left foot in

20  front of you?

21          MR. PHILLIPS:  Objection.  Vague and ambiguous,

22  lacks foundation.  Do you understand the question?

23          THE WITNESS:  No.

24  BY MS. DENNING:

25      Q.  Let me rephrase it.  Were you still underneath

44

Jonathan McCarthy, Volume I
February 11, 2014

1      at that point, when you pulled your pistol out?

2                MR. PHILLIPS:  Lacks foundation.  You can

3      answer.

4                THE WITNESS:  At least one knee.

5      BY MS. DENNING:

6           Q.  Did Victor Ortega say anything at that point?

7           A.  No.

8           Q.  Did you say anything at that point?

9           A.  No.

10          Q.  When you said you were turning your body around,

11     how exactly did you do that?

12               Can you explain -- when you turned your body

13     around, were you on one knee, on both knees?  Can you

14     explain the mechanism that you used to pivot around?

15          A.  Well, when I pushed my revolver away, I had to

16     have been on at least one knee at that point.  Most

17     likely at least my right knee, since that's furthest away

18     from him.  While I'm rotating, you know, my upper body,

19     my knee is staying on the ground most likely, rotating my

20     upper body, facing him.

21          Q.  What happened next?

22          A.  I saw both his hands and him lunging right at

23     me.

24          Q.  Was he on his knees at that point?

25          A.  No, he was getting up.

**Jonathan McCarthy, Volume I**
**February 11, 2014**

1    Q.   Was he on both feet?

2    A.   Both his -- well, can you kind of explain?  He

3    wasn't fully standing.

4    Q.   Were either of his knees touching the ground?

5    A.   No, he was not on -- his knees weren't on the

6    ground, but he was above me.

7    Q.   He was in a crouching position?

8    A.   Yeah, similar to that.

9    Q.   And he was above you?

10   A.   Yes.

11   Q.   Where were you?

12   A.   I was still down on the knee.

13   Q.   Do you know which knee?

14   A.   Probably my right knee.

15   Q.   And when you say that Victor was reaching with

16   both hands, can you explain that?

17   A.   His -- I saw both hands reaching towards the

18   pistol that was now in my hand.

19   Q.   And what did you do?

20   A.   I fired two rounds.

21   Q.   At the time that you fired both rounds, was

22   Mr. Ortega hovering over you?

23   A.   He wasn't on top of me.  He was still in front

24   of me.

25   Q.   So when you fired the gun, was your gun pointed

46

Jonathan McCarthy, Volume I
February 11, 2014

1    level, was it pointed downward, or was it pointed

2    upward?

3            A.   It was --

4            MR. PHILLIPS:   You can answer.

5            THE WITNESS:   It was level, but I was not able

6    to fully extend my arm.   I had to fire from around my

7    waist area because his hands were right there.   And if I

8    extended my pistol out, I would have been handing it to

9    him.

10   BY MS. DENNING:

11           Q.   Did you say anything before you fired?

12           A.   No.

13           Q.   Can you describe what his outstretched hand --

14   well, strike that.

15           Were both of his arms fully extended?

16           A.   Yes.

17           Q.   Were his palms facing any certain direction?

18           A.   I don't recall.   I just remember his hands were

19   open.

20           Q.   Both hands were open?

21           A.   Yes.

22           Q.   Were his fingers spread apart?

23           A.   Yes.

24           Q.   Did he ever, before you fired the shots, attempt

25   to grasp at anything?

47

Jonathan McCarthy, Volume I
February 11, 2014

1       A.   What do you mean by "grasp"?

2       Q.   Did he move his fingers, or did he try to grasp

3   at the gun?

4       A.   That's what I believe he was doing.

5       Q.   With which hand or both?

6       A.   Both.

7       Q.   After you fired the shots, what did you do?

8       A.   At that point, I radioed that I had fired shots,

9   and I reholstered the pistol.

10       Q.   Did you say anything?

11           MR. PHILLIPS:  Besides what you just testified

12   to.

13           THE WITNESS:  No, not right then.

14   BY MS. DENNING:

15       Q.   Did you say -- okay.  Did you ever say, "Oh,

16   fuck"?

17       A.   No.

18       Q.   After you radioed that shots were fired, what

19   did you do next?

20       A.   I holstered my weapon.

21       Q.   And then what did you do?

22       A.   I grabbed my revolver, the backup weapon, and

23   reholstered that.

24       Q.   And then what did you do next?

25       A.   I went over to Ortega and fully handcuffed

                                                        48

Jonathan McCarthy, Volume I
February 11, 2014

1    on your primary weapon or just one hand?

2         A.   Just one hand.

3         Q.   And did you fire consecutive shots?

4         A.   Yes.

5         Q.   As fast as you could fire them?

6              MR. PHILLIPS:   Objection.   Calls for

7    speculation, lacks foundation.   Just don't guess.   You

8    can give her your understanding.

9              THE WITNESS:   I fired them fast.

10   BY MS. DENNING:

11        Q.   Was there any time lapse between the two

12   shots?

13        A.   No.

14        Q.   Bang, bang?

15        A.   Yes.

16        Q.   What is the first question that Sergeant Karsh

17   asked you after this happened?

18        A.   I believe he asked me, "Give me a quick summary

19   of what happened," so he would know.

20        Q.   And what did you tell him?

21        A.   I was telling him that, "We were fighting, and

22   we were fighting over the gun."   And then he -- I kept

23   trying to tell him what happened and he stopped me and

24   then started asking the public safety questions.

25        Q.   When you say you "kept trying to tell him and he

                                                          53

**Jonathan McCarthy, Volume I**
**February 11, 2014**

1    stopped you," what did you keep trying to tell him?

2         A.   Well, I was going to keep telling him, "Yeah, he

3    went for the revolver.  He tried to grab it.  He went for

4    my pistol, and I pulled it, and I had to shoot him."

5         Q.   Did you discuss with him both guns?

6         A.   No.  I don't -- I don't recall.

7         Q.   So you don't know if you told him that first he

8    went for your secondary weapon, and then he went for your

9    primary weapon?

10        A.   I don't remember.  I know I wanted to tell him

11   that, but I don't remember -- he cut me off before I

12   could tell him that.

13        Q.   Did he say why he cut you off?

14        A.   No.  I know now why.

15        Q.   Did you tell Sergeant Karsh that Victor Ortega

16   grabbed your secondary weapon and pointed it at you?

17        A.   No.

18        Q.   When you went to push the secondary weapon away,

19   you let -- you freed both of your hands.  Is that

20   correct?

21             MR. PHILLIPS:  Objection.  Mischaracterizes his

22   prior testimony, lacks foundation.  You can give her your

23   understanding.

24             THE WITNESS:  Well, the right hand was pushing

25   the revolver away.  My left hand was free.

                                                              54

1    back in.

2         Q.  How long did it take you to do that?

3         A.  Less than a second.

4         Q.  And while you were reholstering your Taser, what

5    was Victor Ortega doing?

6         A.  Continuing to move his body around and wiggle

7    his body and struggle.

8         Q.  Prior to June 4, 2012, had you ever shot

9    anyone?

10        A.  No.

11        Q.  Prior to June of 2012, aside from training that

12   you received in the academy, had you received any

13   training regarding use of force?

14        MR. PHILLIPS:  Vague and ambiguous.  But go

15   ahead.

16        THE WITNESS:  Just academy training.

17   BY MS. DENNING:

18        Q.  Why didn't you warn Victor Ortega before you

19   shot him?

20        A.  I had no time.

21        Q.  Did anyone in the San Diego Police Department

22   have any follow-up questions for you after the date of

23   this incident?

24        A.  I don't think so -- no, I don't recall.

25        Q.  Did you ever talk to Sergeant Karsh about this

77

Jonathan McCarthy, Volume I
February 11, 2014

1       A.   The right.

2       Q.   And when you were able to push the gun, in what

3  direction did you push the gun?

4       A.   Straight away.

5       Q.   Was it out of Victor's reach at that point?

6       A.   I believe it was.

7       Q.   When you drew your primary weapon, did you

8  intend to shoot Victor?

9       A.   If he was still coming at me.

10       Q.   If he was still coming at you.  So had he

11  previously been coming at you?

12       A.   Well, the whole incident, struggling and

13  fighting inside the breezeway.  My main thought was, when

14  I'm turning and pulling my pistol out, he's either doing

15  -- three things.  Laying there still, which would be

16  great; running the other way, okay, holster up, resume

17  the chase; or, three, he's coming at me.  And he was

18  coming at me.  He was lunging at me.

19       Q.   How did you know that he wasn't just trying to

20  run away?

21       A.   Because he was lunging right at me.  There was

22  an escape route right behind him, no door.

23       Q.   When -- at what point in your mind did you feel

24  like Victor was no longer trying to get away from you?

25       A.   When I -- when he reached up and grabbed my

                                                          87

**Jonathan McCarthy, Volume I**
**February 11, 2014**

1    revolver, I knew he was not trying to get away.

2         Q.  When he grabbed your revolver?

3         A.  Yes.

4         Q.  When did he do that?

5         A.  When he reached to grab the revolver.

6         Q.  The secondary weapon?

7         A.  Yes.

8         Q.  So that's the first time during this incident

9    that you felt that Victor was not trying to get away from

10   you?

11        A.  No.  At that point, he was trying to kill me.

12        Q.  But my --

13             MS. DENNING:  Can I have my question read back.

14             (Record read.)

15   BY MS. DENNING:

16        Q.  You previously testified that Victor was trying

17   to get away from you at the initial stages of the chase.

18   Correct?

19        A.  Correct.

20        Q.  At what point did you feel like he was no longer

21   trying to get away from you?

22             MR. PHILLIPS:  Objection.  Asked and answered.

23   He just answered this.  But go ahead, you can answer

24   again.

25             THE WITNESS:  When he reached for the revolver,

88

**Jonathan McCarthy, Volume I**
**February 11, 2014**

1       A.   To let her --

2            MR. PHILLIPS:   Objection.   It goes to his

3       spousal privilege.   I'm going to -- I'll let him answer

4       that question but none of the details of what you guys

5       discussed.   Okay?

6            THE WITNESS:   I let her know I was okay.

7       BY MS. DENNING:

8       Q.   Why did you call your dad?

9       A.   Same thing.

10      Q.   Did you tell your dad about what happened?

11      A.   Briefly.

12      Q.   What did you tell him?

13      A.   That someone got into a fight with me over my

14      gun and I had to shoot him.

15      Q.   Was your dad a police officer?

16      A.   No.

17      Q.   Do you recall ever telling Sergeant Howie that

18      you were tired from the struggle with Victor Ortega?

19      A.   No.

20      Q.   Do you ever recall telling him that you just

21      decided to end it?

22      A.   No.

23      Q.   Do you ever recall telling him that you had had

24      enough?

25      A.   No.

                                                           92

Jonathan McCarthy, Volume I
February 11, 2014

```
1        STATE OF CALIFORNIA      )
                                   )
2        COUNTY OF SAN DIEGO       )

3

4               I, Renee K. Papierniak, a Certified Shorthand

5        Reporter, do hereby certify:

6               That prior to being examined, the witness in

7        the foregoing proceedings was by me duly sworn to

8        testify to the truth, the whole truth, and nothing but

9        the truth;

10              That said proceedings were taken before me at

11       the time and place therein set forth and were taken

12       down by me in shorthand and thereafter transcribed

13       into typewriting under my direction and supervision;

14              I further certify that I am neither counsel

15       for, nor related to, any party to said proceedings, not

16       in anywise interested in the outcome thereof.

17              In witness whereof, I have hereunto subscribed

18       my name.

19

20       Dated:   February 21, 2014

21

22       Renee K. Papierniak

23       Renee K. Papierniak
         CSR No. 7056

24

25

                                                            108
```