# EXHIBIT C

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SHAKINA ORTEGA, individually, and as successor of interest of VICTOR ORTEGA, deceased; TAMIA ORTEGA, a minor, by and through her guardian Shakina Ortega; and JACOB ORTEGA, a minor, by and through his guardian Shakina Ortega,<br>     Plaintiffs,<br>  vs.<br>SAN DIEGO POLICE DEPARTMENT, a public entity; JONATHAN MCCARTHY, an individual; CITY OF SAN DIEGO, a public entity; and DOES 1 through 10,<br>     Defendants. | CASE NO. 13-CV-87-LAB (JMA) |

DEPOSITION OF NICHOLAS J. LARUE

February 3, 2014

10:03 a.m.

1230 Columbia Street, Suite 400

San Diego, California 92101

REPORTED BY:

KIMBERLY A. BROADHURST

CSR NO. 13814, RPR, CRR

1

```
 1   already dead.
 2        A.   Okay.  He was still in the same position, on
 3   top of him, straddling him, but it was because he was
 4   wrestling with him.
 5             So he was still -- before I shut the door, he
 6   was still very much on top of the larger gentleman and
 7   he was trying to subdue him.
 8        Q.   Okay.  Where were the officer's hands?
 9        A.   While he was struggling?  His hands -- he was
10   trying to keep his hands down, and so he was on top of
11   him with his hands on top of him, but the man on the
12   bottom was not -- he was bigger than the officer.
13             So he wasn't really having a -- it was pretty
14   easy for this man to swap his hands out of the way and
15   he kept moving his hands out of way and flailing his
16   hands, you know, and he was moving around pretty well.
17   Then the cop was trying to stop that so...
18        Q.   So did the officer have each of his hands on
19   the suspect's arms?
20        A.   At one point, yes.  Before I closed the door,
21   no.  Before I shut the door, he was still struggling
22   with him.  I think his hands were more in his chest area
23   than anything, and he was having a very difficult time
24   keeping him on the ground.
25        Q.   And the suspect's hands, were those just waving
```

27

```
 1   around?
 2        A.   They were -- they were flailing at one point
 3   and then the police officer subdued him and then he got
 4   free and it was like a back-and-forth kind of thing.
 5             But I mean, I wouldn't say -- flailing might
 6   not be a good word for it, but they were not
 7   immobilized.  They were definitely free, and he was, you
 8   know, reaching for his ankles or reaching in his belt
 9   area, around that area of his body.
10        Q.   What makes you think he was reaching for his
11   belt area?
12        A.   It wasn't that -- he was on the ground and so
13   the cop was straddling him and, I mean, if you straddle
14   somebody, his feet were going back, so his ankles were
15   kind of where the larger gentleman's belt was, I guess.
16             So he didn't necessarily reach for his belt but
17   in that general area.  His hands were definitely within
18   that reach.  It looked like to me like he was more so
19   grabbing for his ankle.  He didn't like raise his hand
20   up and reach specifically for his belt.
21        Q.   Okay.  And when you say he was reaching for his
22   ankle, you put that in the middle of the fifteen seconds
23   that you were at the door?
24        A.   Yes.
25        Q.   And did you -- I'm trying to get an idea -- you
```

1  use the word "reaching." Was he -- were his hands just

2  in the ankle area, or did it look like he was going for

3  a specific thing?

4      A.  It looked like he was going for a specific

5  thing.

6      Q.  Okay.

7      A.  And, you know, I know police officers are very

8  well armed, so I assumed that it was -- he was reaching

9  for either a weapon or something. I didn't see it,

10 however.

11     Q.  Okay. So back to my last question just because

12 I think I'm a little bit unclear, right when you shut

13 the door -- because I know that you said that there was

14 some moving around, but the very last positioning that

15 you saw of the two gentlemen before you shut the door,

16 the officer was straddling the suspect?

17     A.  Yes.

18     Q.  And the suspect's hands were still moving

19 about?

20     A.  Yes.

21     Q.  And the officer's hands were where?

22     A.  On his chest-shoulder area. I couldn't really

23 be specific about that, but he was -- he was trying to

24 keep the larger gentleman's hands down.

25     Q.  So you shut the door, and then what did you do?

29

1           At any point was the suspect not laying on the
2    ground, meaning he was up on a knee or up on an elbow or
3    anything like that or was the whole time he was just
4    down on the ground?
5        A.   The entire time I saw him, it was the officer
6    on top of the larger gentleman.  He was on the ground
7    the entire time.
8        Q.   Okay.  At any point did you see the larger
9    gentleman on his side or on his stomach or was he on his
10   back the entire time?
11       A.   When they were struggling, I did see him kind
12   of squirm almost onto his -- I wouldn't say really onto
13   his side, but his back wasn't like -- both shoulder
14   blades was not on the ground, let's just say that.
15       Q.   So there was a lot of movement, but he never
16   got up off the ground?
17       A.   No, no.
18       Q.   And the whole time that you were looking out
19   the door, the open door, were they wrestling?
20       A.   Oh, yeah.
21       Q.   Is that a yes?
22       A.   Yes, they were.  Yes, absolutely.
23       Q.   And at the time that you closed the door -- and
24   I know Ms. Denning asked a lot of "what was the last
25   position" kind of thing when you closed the door.  Do

42

```
 1      you remember that testimony?
 2          A.   Yes.
 3          Q.   Were they still in movement at the time that
 4      you closed the door?
 5          A.   Yes, they were.
 6          Q.   They were still wrestling?
 7          A.   Yes, they were.
 8          Q.   When the officer was giving commands to the
 9      suspect, was it loud and vocal?  Was it quiet?  Can you
10      describe how his commands were coming out?
11          A.   Very, very firm.  You could not confuse what he
12      was saying, and yes, very, very vocal.  Like you
13      could -- I mean, I know the neighbors could hear it.  We
14      definitely could hear it.
15               But we also could hear it a lot because the
16      sound of -- the way the corridor is, like the sound just
17      projects off of everything and came down very clearly
18      what he was saying.
19          Q.   At any point did you think that the officer was
20      kidding?
21          A.   No, never.
22          Q.   Did you review any of Mallory's deposition or
23      the exhibits or anything like that?
24          A.   I did not look at them directly, no.
25          Q.   Okay.  Did you at any point ever see any
```

43

```
 1   officers take the larger gentleman to the ground?
 2        A.   No.
 3        Q.   So when you first opened the door, they were
 4   already on the ground?
 5        A.   Yes.
 6        Q.   Other than the officer straddling the larger
 7   male on the ground, did you see the officer in any
 8   different position, maybe to the side or standing up?
 9        A.   No.
10        Q.   At any point did you see the officer point a
11   gun or something that looked like a gun at the suspect
12   on the ground?
13        A.   No.
14        Q.   So they were still -- so the officer and the
15   suspect were still struggling when you closed the door?
16        A.   Yes, sir.
17        Q.   At any point when you were looking out the
18   door, did you see the larger male cooperate with the
19   officer at all?
20        A.   No.
21        Q.   You also made a statement that you said the
22   officer -- and I wrote it down -- was slapping the man's
23   hands away?
24        A.   Yes.
25        Q.   Can you describe that for me?
```

44

Nicholas J. Larue
February 3, 2014

1  A.  He was trying -- the larger gentleman, like I
2  said, it looked like he was reaching for something, and
3  the officer was trying to take his hands and put them
4  back up towards his head and subdue his arms so I would
5  assume he could put cuffs on him, but I don't think he
6  got to that point.  He was struggling pretty -- it was a
7  wrestling match.
8  Q.  Okay.  So they were both exerting a lot of
9  physical energy at that point?
10  A.  Absolutely, yes.
11  Q.  And the slapping, was that, you know, halfway
12  through the struggle, toward the end of the struggle,
13  before you closed the door?
14  A.  It was just before I started closing the door
15  that I saw him, you know, his hands were not where the
16  officer wanted them to be.  They were kind of -- he was
17  being very squirmy, yes, reaching for his ankle.
18  Q.  Did you ever see the bigger man pick anything
19  up?
20  A.  No.
21  Q.  Okay.  Did you see the bigger man pull anything
22  out of the ankle area of the officer?
23  A.  No.
24  Q.  Did you ever see the bigger man take anything
25  off of the belt?

45

```
 1        A.   No.
 2        Q.   At any point did you see the bigger man with
 3   anything in his hands?
 4        A.   No.
 5        Q.   And you couldn't -- you're not sure what he was
 6   reaching for?
 7        A.   No.
 8        Q.   Did you ever see the officer punch the man on
 9   the ground?
10        A.   I did not see that.
11        Q.   Any blows to him with any objects?
12        A.   No.
13        Q.   This is where I'm kind of jumping around.
14             After the door is closed, did you make eye
15   contact with Mallory?
16        A.   Yes, I did.
17        Q.   Do you know about how long that eye contact
18   was?
19        A.   It was a good, like, maybe one or two seconds,
20   you know.
21        Q.   And during that time you don't recall her
22   looking out the window at all?
23        A.   She did not.
24        Q.   Do you recall her looking out the window
25   after -- when you guys came down at any point that
```

46

1  morning?

2  A.  When we first ran down the stairs, that's the

3  first thing we kind of did was look out the window first

4  and we both kind of peeked out the window and then we

5  opened the door after we peeked.

6  Q.  Okay.  Now, did she also look out the door or

7  did she stay at the window?

8  A.  When?

9  Q.  When you both peeked out the window.

10 A.  When we first ran down the stairs?

11 Q.  Correct, and then you opened the door --

12 A.  Right.

13 Q.  -- you were looking out the open door, correct?

14 A.  Yes, sir.

15 Q.  Did she at any point look out the door?

16 A.  Yes, sir.

17 Q.  Okay.  When she came to the door, was it

18 instantaneous?  Was it a few seconds later?

19 A.  That she stopped looking out the window?

20 Q.  Correct, and came to the open door.

21 A.  Yes.  As soon as I opened the door, she stopped

22 looking out the window and she came over to the door,

23 yes.

24 Q.  And about how far is it between the window and

25 the door?

47

```
 1        A.   A foot.
 2        Q.   Okay.  So if I understand it, the officer and
 3   the suspect are in motion when you close the door?
 4        A.   Yes.
 5        Q.   The officer is still straddling the suspect?
 6        A.   Yes.
 7        Q.   You closed the door.  Now, when you have the
 8   eye contact with Mallory, was it instantaneous or did
 9   anything else happen before you had eye contact with
10   Mallory?
11        A.   No.  We shut the door.  We both looked at each
12   other and then we heard the shots and we hit the ground.
13        Q.   The shots were at least a couple seconds later?
14        A.   Yeah.
15        Q.   Yes?
16        A.   Yes, sir.
17        Q.   Okay.  And maybe you answered this.  You can
18   correct me.
19             How long were you on the ground about?  I know
20   you were longer -- or no, she was longer.
21        A.   Five seconds.
22        Q.   And who was it that opened the door that first
23   time?
24        A.   It was me.
25        Q.   And who opened the door the second time?
```

48

```
1    STATE OF CALIFORNIA        ) ss:

2    COUNTY OF SAN DIEGO        )

3

4         I, Kimberly A. Broadhurst, Certified Shorthand

5    Reporter of the State of California, do hereby certify:

6         That prior to being examined, the witness in the

7    foregoing proceedings was by me duly sworn to testify to

8    the truth, the whole truth, and nothing but the truth;

9         That said proceedings were taken before me at the

10   time and place therein set forth, and were taken down by

11   me in shorthand and thereafter transcribed into

12   typewriting under my direction and supervision.

13        I further certify that I am neither counsel for,

14   nor related to, any party to said proceedings, nor in

15   any way interested in the outcome thereof.

16

17        IN WITNESS WHEREOF, I have hereunto subscribed my

18   name.

19

20   Dated:   February 14, 2014.

21

22

23   _____
     Kimberly A. Broadhurst
24   CSR No. 13814, RPR, CRR

25
```

59