1
2
3
4
5
6
7
8
9
10

# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF CALIFORNIA

11   SHAKINA ORTEGA, et al.,                    CASE NO. 13cv87-LAB (JMA)

12                              Plaintiffs,     **ORDER GRANTING IN PART AND DENYING IN PART**

13        vs.                                   **DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

14   SAN DIEGO POLICE DEPARTMENT, et al.,

15                              Defendants.

16

17        Victor Ortega, husband to Plaintiff Shakina Ortega and father to Plaintiffs Tamia and

18   Jacob Ortega, was shot and killed by Defendant Officer Jonathan McCarthy of the San

19   Diego Police Department (also a Defendant) on June 4, 2012 while Ortega was fleeing

20   arrest. Defendants move for summary judgment, arguing that the evidence does not support

21   any of Plaintiffs' six causes of action. (Docket no. 49, Motion.) Defendants rely primarily on

22   Officer McCarthy's story about what happened that day.  Plaintiffs oppose summary

23   judgment and offer evidence to challenge some of the underlying material facts. (Docket no.

24   66, Opposition Brief.) The Court grants in part and denies in part Defendants' motion.

25   **I.  Factual Background**

26        Except where noted, the following factual background is undisputed.  On the morning

27   of June 4, 2012, Shakina and Victor Ortega argued about whether he would take their six-

28   year-old daughter, Tamia, to school.  Because Victor was unemployed and Shakina worked,

their argument escalated into whether Victor did enough to support the family. Though they had been married for eight years, she told him that his refusal was why their relationship was not likely to work out. (*See* Docket no. 49-5, Cline Decl. Ex. C, Tr. of Interview with Shakina Ortega at 3.) Victor kicked toward Shakina's face, his bare feet connected with her mouth, and she began bleeding. (*Id.*) After a scuffle, Victor began to hug Shakina and apologize to her, crying and declaring that what he did was an accident. (*Id.* at 4.) Shakina called 9-1-1 and requested emergency assistance. (Docket no. 49-7, Cline Decl. Ex. E, Emergency Tr.)

Although the parties dispute whether Victor's actions were accidental or purposeful, they agree that he fled the family's apartment when police responded to the call. (*Compare* Mot. at 3 *with* Opp'n Br. at 6-7.) Officers Jonathan McCarthy and Godfrey Maynard arrived at the scene in separate vehicles in time to see Victor fleeing; Officer Maynard reported Victor's direction while Officer McCarthy began immediate pursuit. (Docket no. 49-10, McCarthy Decl. ¶¶ 7-13; Docket no. 66-6, Denning Decl. Ex. D.) A chase ensued through the housing complex, and Officer McCarthy caught up to Victor in a narrow, deserted corridor or breezeway. (Docket no. 49-10, McCarthy Decl. ¶¶ 14-16; Docket no. 66-6, Denning Decl. Ex. B., Investigator's Rep. at 8-10.) According to Officer McCarthy, he attempted to detain Victor, but a fight began in which Officer McCarthy used a "leg sweep" maneuver to bring Victor to the ground. (Docket no. 49-10, McCarthy Decl. ¶¶ 19-20.) Officer McCarthy's leg sweep was complicated by the fact that his secondary weapon was affixed to the leg he used by an elastic band known as an ankle holster; after Victor fell, Officer McCarthy fell on top of him, and his secondary weapon came loose to the ground. (*Id.* ¶ 20-21; *accord* Docket no. 66-6, Denning Decl. Ex. D., McCarthy Deposition at 66.)

Accounts of the next few seconds, up to Officer McCarthy's decision to shoot Victor, diverge. Originally, SDPD's investigation concluded that Victor took control of Officer McCarthy's secondary weapon and threatened him with it. (Docket no. 49-6, Cline Decl. Ex. D, SDPD Investigator's Rep. at 2; *see also id.* Ex. K, Homicide Team 5 Scene Briefing Tr. ("Officer McCarthy's spare weapon that's on his ankle holster . . . fell to the ground. The

1   suspect saw this, picked up the gun and raised it towards Officer McCarthy.   Officer

2   McCarthy drew his own weapon and fired two rounds.".)   Later, SDPD Sergeant Joe Howie

3   issued a report concluding that Victor tried *but failed* to take Officer McCarthy's gun, noting

4   scrape marks on the side of the weapon which indicated that it slid on the cement walkway

5   where the altercation occurred without being picked up.   (Docket no. 49-6, Cline Decl. Ex.

6   D, at 7.)   Forensic analysis of the secondary weapon did not show any of Victor's DNA on

7   the gun.   (Docket no. 66-10, Ex. WW at 61-62.)[1]   Officer McCarthy's declaration in support

8   of Defendants' motion for summary judgment states that Victor reached for the gun with his

9   right hand, briefly touched it, but never grasped it.   (Docket no. 49-10 at 4.)   Whereas some

10  evidence indicates that Officer McCarthy was able to handcuff Victor's left hand while on top

11  of him after they fell, (Docket no. 66-6, Denning Decl. Ex. C,  Howie Investigation, at 44),[2]

12  other evidence indicates that he did not do so until Victor had been shot and paramedics

13  arrived, (Docket no. 49-6, Cline Decl. Ex. D, McCarthy Depo. at 6).   Still other evidence

14  indicates that it may have been Victor's right hand – the hand he is supposed to have used

15  to reach for the gun – that was cuffed.   (Docket no. 66-8, Denning Decl. Ex. U, Decl. of

16  Jason Crisostomo ¶ 4 ("Once the paramedics arrived, they pulled the body out of the alley

17  corridor . . . .  I saw blood on the man's face and a handcuff on his right wrist.").)

18       Only Officer McCarthy survived to bear eyewitness to the last, crucial moments.   He

19  testifies that he broke apart from Victor to move the secondary weapon a safe distance

20  away, that he drew his primary weapon while turning to face Victor, and that he saw Victor

21

22       [1] Defendants object to Plaintiffs' use of the forensic report on authenticity and hearsay grounds.  Defendants produced the report as part of SDPD's homicide file.  (Docket no. 66-1

23  ¶ 56.)  Its authenticity is clear, *see* Fed. R. Evid. 901(b)(7), and it falls under the "public records" hearsay exception, *see* Fed. R. Evid. 803(8)(A)(iii).   The Court overrules the

24  objection.

25       [2] Defendants make the same evidentiary objections to Plaintiffs' use of Sgt. Howie's investigation report and interview of Officer McCarthy.  The document is also part of SDPD's

26  homicide file.  (Docket no. 66-1 ¶ 10.)  It consists purely of statements by SDPD officers who are either party-opponents themselves (*e.g.*, McCarthy) or representatives of party opponent

27  SDPD.  Its authenticity is clear, *see* Fed. R. Evid. 901(b)(7), and the statements it contains are either not hearsay as party-opponent admissions, Fed. R. Evid. 801(d)(2), or excepted

28  from being hearsay as public records, Fed. R. Evid. 803(8)(A)(iii).  The objection is overruled.

1   rising off the ground to lunge toward him.  (Docket no. 49-10 at 4-5.)  Believing that Victor

2   was now attempting to grab his *primary* weapon, Officer McCarthy fired two rounds.  (*Id.* at

3   5.)  Victor's autopsy shows that the first bullet hit Victor in the abdomen and the second one

4   hit him in the back of the neck.  (Docket no. 66-8, Denning Decl. Ex. X, at 24.)  Officer

5   McCarthy stated that Victor was either one foot away from the primary weapon in his hand,

6   (*see* Docket no. 66-6, Ex. C, at 50.), or one to two feet away, (*see* Docket no. 49-10,

7   McCarthy Decl., ¶ 28.)  In contrast, Plaintiffs' forensic expert examined Victor's autopsy

8   report, noted that there was no evidence of gunpowder residue or stippling on Victor's

9   clothing or body (including Victor's entry wounds), and concluded that Victor could not have

10  been grabbing at the gun if he were so close.  (Docket no. 66-7, Ex. H to Denning Decl.,

11  Turvey Expert Rep. and Supplement, Exs. 1 and 2.)[3]  In other words, Plaintiffs offer evidence

12  that Victor was either not reaching for Officer McCarthy's gun, or that he must have been

13  over three feet away, or both. (*See id.*)

14       Although Officer McCarthy and Victor were alone in the walkway, bystanders were

15  close enough to hear some of the exchange.  The bystanders reported sounds of a struggle,

16  a loud thump like people falling to the ground, metal clinking, one voice (McCarthy's) saying

17  "Get down on the ground" and another voice responding, "Are you kidding me?" and "Get

18  the f**k off of me, I'm gonna sue you!" – followed finally by the two gunshots.  (*Accord*

19  Docket no. 66-7, Ex. P at 103-04 *with id.* Ex. Q at 111; *id.* Ex. R at 115 *with id.* Ex. S at 123;

20  ///

21  ///

22  ///

23

24       [3] Defendants object to Turvey's declaration, report, and supplemental report as
    inauthentic and hearsay.  It's hard to imagine why Denning's declaration identifying each
25  document as "a true and correct copy" of what it purports to be should not be enough to
    authenticate them.   (*See* Docket no. 66-1 ¶ 15.)   Dr. Turvey's declaration in turn
26  authenticates his reports, as well.  (Docket no. 66-7, Ex. H, at 1.)  Even if the report is
    hearsay, Rule 56(c) only allows an objection "that the material cited to support or dispute a
27  fact cannot be presented in a form that would be admissible in evidence."  Fed. R. Civ. P.
    56(c).  The Court may overlook the hearsay status of an expert report on the grounds that
28  the expert would be able testify to the contents of the report at trial.  *See Celotex*, 477 U.S.
    at 324 (stating that a party need not produce evidence in a form that would be admissible
    at trial in order to avoid summary judgment).  The Court overrules the objection.

1    *see also* Docket no. 66-8, Ex. T at 2-3; *id.* Ex. U at 6-7.)[4]  One ear-witness specifically

2    reported hearing the sound of one or two footsteps followed by two gunshots.  (Docket no.

3    66-6, Ex. P, at 104.)  Another noted that he believed Victor's "tone of voice was one of

4    compliance and disbelief, not confrontational or violent."  (Docket no. 66-8, Ex. U ¶ 6.)[5]

5    **II. Legal Standards**

6        Summary judgment is appropriate where "there is no genuine issue as to any material

7    fact and . . . the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P.

8    56(c). It is the moving party's burden to show there is no factual issue for trial.  *Celotex Corp.*

9    *v. Catrett*, 477 U.S. 317, 323 (1986).  If the moving party meets its burden, the burden shifts

10   to the non-moving party to show there is a genuine issue for trial.  *Id*. at 331.  The Court may

11   grant summary judgment as to some material facts.  Fed. R. Civ. P. 56(g).

12       The Court considers the record as a whole and draws all reasonable inferences in the

13   light most favorable to the non-moving party. *Fairbank v. Wunderman Cato Johnson*, 212

14   F.3d 528, 531 (9th Cir. 2000). The Court does not make credibility determinations or weigh

15   conflicting evidence.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).  Rather, the

16   Court determines whether the record "presents a sufficient disagreement to require

17   ───────────────────────

18       [4] Defendants object to Plaintiffs' use of ear-witness testimony taken down in official
     reports – Plaintiffs' exhibits P, R, T, and V – as inauthentic and hearsay.  Defendants
19   produced the reports as part of SDPD's homicide file, (Docket no. 66-1 ¶¶ 23, 25, 27, & 29),
     and the Court sees little reason to doubt that the exhibits are what they claim to be, *see* Fed.
20   R. Evid. 901(b)(7).  Their status as hearsay is trickier.  It is true that "[i]n general, statements
     by third parties who are not government employees (or otherwise under a legal duty to
21   report) may not be admitted pursuant to the public records exception but must satisfy some
     other exception in order to be admitted." *United States v. Morales*, 720 F.3d 1194, 1202 (9th
22   Cir. 2013); *see also United States v. Pazsint*, 703 F.2d 420, 424 (9th Cir. 1983) (holding that
     "entries in a police report which result from the officer's own observations and knowledge
23   may be admitted but that statements made by third persons under no business duty to report
     may not" be admitted under the business records exception.).  But this is a civil matter, and
24   the Court may admit "factual findings from a legally authorized investigation."  Fed. R. Evid.
     803(8)(A)(iii).  The statements may also be admitted under the "recorded recollection"
25   exception.  Fed. R. Evid. 803(5).  In any event, Plaintiffs can presumably present the
     declarants' testimony in an admissible form at trial, for instance by calling them as witnesses,
26   so their potential hearsay status does not limit their helpfulness at the summary judgment
     stage.  *See Celotex*, 477 U.S. at 324; Fed. R. Civ. P. 56(c).  The objection is overruled.

27       [5] Defendants object to this evidence as inadmissible opinion of a lay witness.  But the
28   witness here is not testifying as an expert; the given testimony is rationally based on his
     perception, helpful for understanding his testimony, and not based on scientific, technical,
     or other specialized knowledge.  Fed. R. Evid. 701.

1  submission to a jury or whether it is so one-sided that one party must prevail as a matter of

2  law." *Id*. at 251–52.

3  **III.  Discussion**

4      Plaintiff's First Amended Complaint asserts six causes of action against each of the

5  three named defendants: 1) violation of civil rights under 42 U.S.C. § 1983; 2) discrimination

6  and other violation of civil rights under Cal. Civ. Code § 51.7; 3) violation of civil rights under

7  Cal. Civ. Code § 52.1; 4) assault and battery under Cal. Gov. Code § 815.2; 5) wrongful

8  death; and 6) negligence.  (Docket no. 17-1, First Amended Complaint ("FAC").)  Defendants

9  move for summary judgment on all six claims.  Plaintiffs voluntarily dismiss their Section

10 1983 claim against SDPD but otherwise oppose summary judgment.

11     **A. Plaintiffs' Claims under 42 U.S.C. § 1983**

12     Section 1983 provides plaintiffs with a cause of action when a person acting under

13 the color of state law deprives them of any federal constitutional right.   42 U.S.C. § 1983.

14 Here, Plaintiffs assert that Officer McCarthy's use of deadly force was excessive under the

15 Fourth and Fourteenth Amendments, and that the City of San Diego implemented

16 unconstitutional policies or customs in violation of *Monell v. Dep't of Soc. Servs.*, 436 U.S.

17 658 (1978).[6]  The Court addresses Defendants' grounds for summary judgment as to each

18 claim in turn.[7]

19 ///

20 ///

21

22     [6] Defendants dubiously argue that Plaintiffs have not asserted an excessive force
   claim against Officer McCarthy.  (See Mot. at 10 n.7.)  But in what Defendants call an
23 abundance of caution, they move for summary judgment that Officer McCarthy is entitled to
   qualified immunity for his actions.  Defendants' caution, while not precisely abundant, is
24 certainly warranted.  Plaintiffs explicitly sue Officer McCarthy under excessive force and
   deliberate indifference theories.  (FAC ¶¶14, 20.)
25

26     [7] Plaintiffs' First Amended Complaint also asserts that Defendants violated Shakina's,
   Tamia's, and Jacob's constitutional rights.  (*See, e.g.*, FAC ¶ 24 (alleging that Shakina "was
27 taken against her will to the hospital and detained there for several hours" without telling her
   of her husband's death); *id.* ¶24 (asserting that Victor's wife and children were deprived of
28 a constitutionally protected liberty interest in their husband and father, respectively).
   Because Defendants do not move for summary judgment on these claims, the Court does
   not address them further.

**1. Excessive Force under the Fourth Amendment and Qualified Immunity**

Defendants move for summary judgment on the grounds that Officer McCarthy did not use excessive force in attempting to stop Victor and defend himself, and further that he has qualified immunity from liability.  (Mot. at 10-18.)  Under the Fourth Amendment, law enforcement may use "objectively reasonable" force to carry out seizures, and objective reasonableness is determined by an assessment of the totality of the circumstances. *Graham v. Connor*, 490 U.S. 386, 397 (1989).  An officer's use of deadly force is reasonable only if "the officer has probable cause to believe that the suspect poses a significant threat of death or serious physical injury to the officer or others."  *Tennessee v. Garner*, 471 U.S. 1, 3 (1985).  Because this inquiry is inherently fact specific, the "determination whether the force used to effect an arrest was reasonable under the Fourth Amendment should only be taken from the jury in rare cases."  *Headwaters Forest Def. v. County of Humboldt*, 240 F.3d 1185, 1205-06 (9th Cir. 2000), *judgment vacated on other grounds*, 534 U.S. 801, (2001); *see also Torres v. City of Madera*, 648 F.3d 1119, 1125 (9th Cir. 2011) (summary judgment "in excessive force cases should be granted sparingly"); *Liston v. County of Riverside*, 120 F.3d 965, 976 n.10 (9th Cir. 1997) (finding that excessive force is "ordinarily a question of fact for the jury"); *Chew v. Gates*, 27 F.3d 1432, 1443 (9th Cir. 1994) ("[W]hether a particular use of force was reasonable is rarely determinable as a matter of law.").

In the deadly force context, courts are not permitted to "simply accept what may be a self-serving account by the police officer."  *Scott v. Henrich*, 39 F.3d 912, 915 (9th Cir. 1994).  "Because the person most likely to rebut the officers' version of events—the one killed—can't testify, '[t]he judge must carefully examine all the evidence in the record . . . to determine whether the officer's story is internally consistent and consistent with other known facts.'"  *Cruz v. City of Anaheim*, 765 F.3d 1076, 1079 (9th Cir. 2014) (quoting *Scott*, 39 F.3d at 915).  Where the officer's story would justify his use of deadly force, the proper inquiry is whether any reasonable jury could find it more likely than not that the officer's story is false. *See id.*

///

1  "An officer using deadly force is entitled to qualified immunity, unless the law was

2  clearly established that the use of force violated the Fourth Amendment." *Wilkinson v.*

3  *Torres*, 610 F.3d 546, 550 (9th Cir. 2010) (citing *Brosseau v. Haugen*, 543 U.S. 194, 198

4  (2004).  Qualified immunity involves a two-part inquiry: first, "whether the facts that a plaintiff

5  has alleged . . . or shown . . . make out a violation of a constitutional right," and second,

6  "whether the right at issue was 'clearly established' at the time of defendant's alleged

7  misconduct." *Pearson v. Callahan*, 555 U.S. 223, 232 (2009) (quoting *Saucier v. Katz*, 533

8  U.S. 194 (2001)).

9  **A. "Clearly Established Right"**

10  Case law makes clear that an officer may not use deadly force to apprehend a

11  suspect where the suspect poses no immediate threat to the officer or others.  *Garner*, 471

12  U.S. at 11.  On the other hand, it is not constitutionally unreasonable to use deadly force

13  "[w]here the officer has probable cause to believe that the suspect poses a threat of serious

14  physical harm, either to the officer or to others." *Id.*  It would be unquestionably reasonable

15  for a police officer to shoot a suspect in Victor's position who violently resisted arrest and

16  reached for the officer's weapon, just as it would be clearly unreasonable for a police officer

17  in Officer McCarthy's position to fire if the suspect did not make such a threatening gesture.

18  *See Billington v. Smith*, 292 F.3d 1177, 1185 (9th Cir. 2002) (holding that deadly force was

19  justified where a suspect violently resisted arrest, physically attacked the officer, and

20  grabbed the officer's gun).  The law set forth in *Garner* governing the use of deadly force to

21  effect a seizure of a suspect is clearly established.

22  If a jury were to find that Victor could not have grabbed at Officer McCarthy's weapon,

23  and that Officer McCarthy violated Victor's rights by shooting him while he posed no

24  significant threat, there is little question that the violation would be obvious.  *See Brosseau*

25  *v. Haugen*, 543 U.S. 194, 199 (2004) (per curiam) ("[I]n an obvious case, standards can

26  'clearly establish' the answer, even without a body of relevant case law.")  Indeed,

27  Defendants do not dispute Victor's clearly established right not to be shot if he posed no

28  serious harm to Officer McCarthy.  (Mot. at 16-18.)  This is not a case where officers might

1   be entitled to qualified immunity because "officers of reasonable competence could disagree"

2   whether they may use deadly force on a suspect posing no physical threat.  *Cf.* Malley v.

3   Briggs, 475 U.S. 334, 341 (1986).  Rather, the issue is whether Plaintiffs have made out a

4   violation of a constitutional right.

5                              **B.  Violation of the Fourth Amendment**

6           Could any reasonable jury find it more likely than not that Victor *didn't* reach for Officer

7   McCarthy's weapon?  Defendants' motion for summary judgment relies on the testimony of

8   Officer McCarthy to support their claim that Victor reached for the officer's weapon from one

9   or two feet away.  In opposing summary judgment, Plaintiffs dispute those facts.

10          Importantly, Plaintiffs have submitted evidence that would give a reasonable jury

11   pause.  Their forensic expert examined Victor's autopsy report and noted that there was no

12   evidence of gunpowder residue or stippling on Victor's body (including Victor's entry wounds)

13   or clothing.  The expert concluded that Victor could not have been grabbing at the gun if he

14   was as close as Officer McCarthy said he was, directly contradicting Officer McCarthy's

15   stated basis for using deadly force.  (Docket no. 66-7, Ex. H to Denning Decl., Turvey Expert

16   Rep. and Supplement, Exs. 1 and 2.)  Given the proximity of the parties, the narrowness of

17   the corridor, and the officer's own testimony, a reasonable jury may doubt that Victor could

18   have been reaching for Officer McCarthy's gun when it fired, without receiving any gunshot

19   residue on his hands, clothing, or wounds.

20          In reaching that conclusion, the jury might take notice of inconsistencies in Officer

21   McCarthy's testimony.  In the transcript of Sergeant Howie's investigation the same morning

22   as the shooting, he asked Officer McCarthy about the secondary weapon – "[D]id he ever

23   grab it at all?" – and Officer McCarthy responded definitively: "No."  (Docket no. 66-6, Ex. C,

24   at 50.)  But in his later declaration, McCarthy's story changed: "The suspect used his free

25   arm to grab for my back-up weapon.  I immediately reached forward and blocked the

26   suspect's hand.  He was able to briefly touch the gun, but my action prevented him from

27   getting a firm grasp."  (Docket no. 49-10, McCarthy Decl., ¶24.)  There is a further potential

28   inconsistency around Officer McCarthy's use of a non-lethal taser.  McCarthy testified that

after he fell on top of Victor, there was a moment when (a) he had Victor's left hand behind Victor's back, (b) he had his taser drawn, and (c) Victor made an effort to grab the loose secondary gun. (Docket no. 66-6, Denning Decl. Ex. C., at 11-12.)  But McCarthy also said he switched from physical to lethal force (i.e., holstering the taser) precisely when he saw Victor going for the loose gun, because that action specifically made McCarthy think, "He [Victor] wants to kill me." (*Id.* at 17-18.)   In other words, McCarthy's testimony has him completing the following actions with only two hands: holding Victor down, drawing a taser with one hand, struggling to handcuff Victor (presumably with his other hand), successfully cuffing Victor's one hand while Victor's other one got free, and moving to holster his taser *after* seeing Victor reach for the secondary weapon – somehow, McCarthy  knocked the secondary weapon out of Victor's reach while one hand was restraining Victor and the other was holstering a taser. (*See id.*)  One might suggest that Officer McCarthy moved to knock the secondary weapon aside so quickly that it was practically as Victor reached for it, but this is contradicted by his specific testimony that he decided to reholster the taser and switch to deadly force *after* seeing Victor go for the secondary weapon within his reach.  In any event, this is the moment where Officer McCarthy is supposed to be using one hand to handcuff Victor and another hand to manage his taser.  Officer McCarthy's later declaration in support of Defendants' motion for summary judgment attempts to clarify the series of events, but in doing so conspicuously fails to mention the taser at all.  (See Docket no. 49-10.)

At this stage, the Court does not weigh the evidence or resolve issues of credibility. *Anderson*, 477 U.S. at 255. If a jury believed Plaintiffs' evidence and rejected Defendants' evidence, it could find that events did not unfold as McCarthy testified.  In light of the evidence contradicting McCarthy's account of events – including some of his own statements – summary judgment on qualified immunity against Plaintiffs' Fourth Amendment Section 1983 claim is not warranted.  The motion is **DENIED**.

///

///

///

**2. Excessive Force under the Fourteenth Amendment and Qualified Immunity**

Plaintiffs also assert that Defendant McCarthy violated Victor's Fourteenth Amendment right, and Defendants move for summary judgment that Officer McCarthy is entitled to qualified immunity for this claim as well.   (Mot. at 10-11.)

The Fourteenth Amendment's Due Process Clause creates a right to be free from "executive abuse of power . . . which shocks the conscience." *County of Sacramento v. Lewis*, 523 U.S. 833, 846 (1998). "In determining whether excessive force shocks the conscience, the court must first ask whether the circumstances are such that actual deliberation by the officer is practical." *Wilkinson v. Torres*, 610 F.3d 546, 554 (9th Cir. 2010) (internal quotations and alterations omitted).  If the officer in question was faced with a time frame where actual deliberation was practical, a plaintiff may establish a Fourteenth Amendment violation by showing that the officer "acted with deliberate indifference." *Porter v. Osborn*, 546 F.3d 1131, 1137 (9th Cir. 2008).  Otherwise, if the officer "faced an evolving set of circumstances that took place over a short time period necessitating 'fast action,'" a plaintiff must make a higher showing that the officer "acted with a purpose to harm" the plaintiff. *Id.* at 1139 (quoting *Lewis*, 523 U.S. at 853).  "[T]he overarching test under either is whether the officer's conduct 'shocks the conscience.'" *Id.*  The Court conducts the same two-step inquiry for qualified immunity. *See Wilkinson*, 610 F.3d at 555; *see also Estate of Kosakoff v. City of San Diego*, 460 Fed. Appx. 652, 654-55 (9th Cir. 2011).

There is no doubt that case law clearly establishes Victor's Fourteenth Amendment right to be free from an officer's use of force that would shock the conscience, and the parties do not argue otherwise.  Instead, Officer McCarthy's qualified immunity comes down to the other step of the inquiry: whether Plaintiffs make out a Fourteenth Amendment violation. *See Pearson*, 555 U.S. at 232.  The parties also dispute whether the events leading up to Victor's death allowed for Officer McCarthy to engage in actual deliberation, and as a result they do not agree on whether the "deliberate indifference" or "purpose to harm" standard applies.

1    The Court need not determine which of these standards applies here, because a

2  reasonable jury could conclude that Officer McCarthy violated the Fourteenth Amendment

3  under the more stringent purpose-to-harm standard.  Under the purpose to harm standard,

4  a plaintiff must show that an officer's purpose was "to cause harm unrelated to the legitimate

5  object of arrest."  *Lewis*, 523 U.S. at 836.  According to the Ninth Circuit, it is precisely "the

6  intent to inflict force beyond that which is required by a legitimate law enforcement objective

7  that 'shocks the conscience' and gives rise to liability under § 1983 . . . ."  *Porter*, 546 F.3d

8  at 1140.  Under *Porter*, a jury may also consider the manner in which an officer needlessly

9  caused a confrontation to escalate when determining whether the officer acted with a

10  purpose to harm.  *Id.* at 1141-42.

11    Though the relevant facts leading up to the confrontation between McCarthy and

12  Victor are in dispute, the Court must presume the facts to be to be those offered by the

13  non-moving party. *See Saucier*, 533 U.S. at 201.  If, as some evidence suggests, Victor did

14  not reach for Officer McCarthy's weapons, did not resist arrest, and spoke in a way that

15  suggested non-violent compliance and disbelief (e.g., "Are you kidding me?" and "I'm gonna

16  sue you!"), a jury may believe that Officer McCarthy acted with an impermissible intent to

17  harm Victor rather than to protect himself.

18    Because Plaintiffs have made out a violation of Victor's clearly established Fourteenth

19  Amendment right, the Court **DENIES** Defendants' motion for summary judgment on qualified

20  immunity.

21            **3. Plaintiff's *Monell* Claim**

22    Section 1983 provides for liability against a municipality only if an unconstitutional

23  action "implements or executes a policy statement, ordinance, regulation, or decision

24  officially adopted and promulgated by that body's officers."  *Monell*, 436 U.S. at 690.  Under

25  a *Monell* claim,

26        a local government body can be held liable under § 1983 for policies of
         inaction as well as policies of action.  A policy of action is one in which the
27        government body itself violates someone's constitutional rights, or instructs its
         employees to do so; a policy of inaction is based on a government body's
28        failure to implement procedural safeguards to prevent constitutional violations.

*Jackson v. Barnes*, 749 F.3d 755, 763 (9th Cir. 2014).  The parties agree that Plaintiffs are pursuing an inaction theory premised on the idea that San Diego failed to supervise, train, and discipline officers adequately; maintained inadequate procedures; and ratified officers' misconduct through their inaction.  (*Accord* Mot. at 7 *with* Opp'n Br. at 17 & n.7; *see also* FAC ¶¶ 25(a)–(h)).

In inaction cases, a municipal defendant may be liable only where the "policy amounts to deliberate indifference to the plaintiff's constitutional right." *Tsao v. Desert Palace, Inc.*, 698 F.3d 1128, 1143 (9th Cir. 2012).  This requires showing that the defendant "was on actual or constructive notice that its omission would likely result in a constitutional violation." *Id.* at 1145; *see also Edgerly v. City and Cnty. of San Francisco*, 599 F.3d 946, 960 (9th Cir. 2010) ("[L]iability attaches only where the entity's policies evince a deliberate indifference to the constitutional right and are the *moving force behind the constitutional violation*.") (internal quotations omitted) (emphasis added).

The parties contest the adequacy of SDPD's policies for inspecting and maintaining secondary weapon holster quality.  Plaintiffs argue that SDPD's poor procedures and lax supervision allowed Officer McCarthy to wear an unsanctioned and dangerously flimsy ankle holster, which in turn allowed his secondary weapon to come loose during the struggle with Victor, creating the situation where Officer McCarthy would eventually shoot Victor.  (Opp'n Br. at 18.)  Defendants move for summary judgment that their policies were adequate and were not responsible for Victor's death.  (Mot. at 7-9.)

The real issue here is causation: even if SDPD's policies were careless and ineffectual, the municipality would not be liable under *Monell* unless its inaction would likely cause a constitutional violation.  Plaintiffs present evidence that SDPD's weapon holster policies may be inconsistent, overly permissive, not carefully overseen, and poorly enforced. (*E.g.*, Docket no. 66-9, Denning Decl. Ex. EE, Clark Rep.; Docket no. 66-10, Denning Decl. Ex. OO, Clark Depo.)  But their evidence as to causation pales in comparison.  Plaintiffs concede that they lack evidence of any other instance where SDPD's weapon holster policies may have caused potential constitutional violations.  (Opp'n Br. at 17 n.7.)  Because

the time for fact discovery has closed, (*see* Docket no. 32, Amended Sched. Ord.), the record does not support a conclusion that these policies make any constitutional violation *likely*. *See Tsao*, 698 F.3d at 1145.

Instead of coming forward with direct evidence of causation, Plaintiffs say that McCarthy's testimony should be enough. In their view, McCarthy concedes that his ankle holster's failure caused Victor's death because he says it was the weapon coming loose which spurred his decision to switch to deadly force. (Opp'n Br. at 18 (citing Denning Decl. Ex. C., Howie Investigation, and Ex. D, McCarthy Depo.).) This is not a fair characterization of the evidence. McCarthy's testimony was that it was Victor's decision to *reach* for the secondary weapon on the ground that made him believe Victor wanted to kill him. (Docket no. 66-6, Denning Decl. Ex. C., Howie Investigation at 17-18; *id.* Ex. D, McCarthy Depo. at 72-73.) Even drawing all factual inferences favorably for Plaintiffs, they provide no evidence that the flimsiness of McCarthy's ankle holster, and the policies which allowed it to be that way, were "the moving force behind the constitutional violation." *Edgerly*, 599 F.3d at 960.

It does not violate anyone's constitutional rights to have a police officer's secondary weapon come loose while the officer is effecting an arrest. Plaintiffs wisely refrain from continuing the logical chain that would connect flimsy holders with officers shooting suspects. Presumably, it would go something like this: more weapons coming loose during arrests in turn causes more suspects to reach for those weapons, placing more officers in danger and resulting in more suspects being shot. There are two problems with this train of thought. First, Plaintiffs' evidence is that Victor did *not* reach for the weapon, and so it cannot be said that the alleged policy caused *his* constitution violation as required in a *Monell* analysis. *See Hayes v. County of San Diego*, 736 F.3d 1223, 1231 (9th Cir. 2013) (holding that a *Monell* claim must be made on the same basis as the underlying constitutional violation). Second, it is *not* a constitutional violation for officers to use deadly force where a suspect resists arrest and reaches for the officer's weapon. *Tennessee v. Garner*, 471 U.S. 1, 3 (1985); *County of Sacramento v. Lewis*, 523 U.S. 833, 846 (1998).

///

1   None of the alleged policies or practices *caused* Officer McCarthy to shoot Victor.

2   Defendants' motion for summary judgment as to Plaintiffs' *Monell* claim is **GRANTED**.

3   **B. California Civil Code § 51.7**

4   California's Ralph Civil Rights Act, Cal. Civil Code § 51.7, creates a "right to be free

5   from any violence, or intimidation by threat of violence, committed against their persons or

6   property" because of their race or other protected characteristic.  Plaintiffs' second cause of

7   action maintains that Officer McCarthy shot Victor "as a result of his racial prejudice against

8   him because he was a Latino male" in violation of § 51.7.  (FAC ¶¶ 38-44.)  An essential

9   element of a Ralph Act claim is that the protected characteristic be "a motivating reason for

10   the defendant's conduct." *Austin B. v. Escondido Union School Dist.*, 149 Cal. App. 4th 860,

11   881 (2007) (citing Judicial Council of California Civil Jury Instructions ("CACI") § 3063).

12   Plaintiffs agree that they must produce evidence of McCarthy's racial motivations to

13   survive summary judgment, and admit that they have not.  (Opp'n Br. at 22:10-18.)  Instead,

14   they argue that they were prevented from presenting facts essential their opposition due to

15   an unresolved discovery dispute; evidently, when Defendants produced Officer McCarthy's

16   pre-employment screening records, they redacted information that may have described his

17   biases.  (Docket no. 66-5, Amended Denning Decl. ¶3.)  As a result, Plaintiffs ask for a

18   deferral of summary judgment under Fed. R. Civ. P. 56(d).  (*See* Opp'n Br. at 22.)  The

19   discovery dispute at issue was resolved on May 9, 2014, when Magistrate Judge Adler

20   ordered the parties "to conduct further research to locate specific federal authority regarding

21   the discoverability of pre-employment screening documents of law enforcement officers in

22   federal civil rights actions, and to exchange such authority with the opposing party

23   Defendants produced."  (Docket no. 57 at 2.)  If the meet-and-confer was inadequate to

24   solve their dispute, Judge Adler continued, "the parties shall file a new joint motion in which

25   each party thoroughly sets forth its argument with citations to specific, governing authority"

26   missing from their previous motion.  (*Id.*)  Although Plaintiffs informed the Court on June 6,

27   2014 that they "anticipate the need to file another motion in Judge Adler's department" on

28   ///

- 15 -

13cv87

1   this issue, (Docket no. 66-5 ¶ 5), they have not done so in the intervening five months, and

2   the deadline for fact discovery has long passed, (Docket no. 32, Amended Sched. Ord.).

3       Plaintiffs have failed to show any cause for their delay or failure to comply with Judge

4   Adler's prescribed course of action.  In addition, there is no indication that such information

5   would even be helpful in proving Plaintiffs' claim, since the record does not support an

6   inference that McCarthy even learned of Victor's race prior to his decision to shoot Victor.

7   The only evidence Plaintiffs cite for McCarthy's supposed knowledge of Victor's race is

8   Shakina's 9-1-1 call describing Victor as Hispanic, (Opp'n Br. at 22 (citing Docket no. 66-6,

9   Ex. B)), but McCarthy denies ever hearing the 9-1-1 call, (Docket no. 66-6, McCarthy Depo.

10  at 62 ("At the time he was running away from me, I didn't know anything about him except

11  that he was a fleeing felon.")).  McCarthy further testified that he did not know Victor's name,

12  and thought Victor was white.  (*Id.* at 63.)  The Court sees no evidence that would support

13  even an inference of racial motive by Officer McCarthy, and **GRANTS** Defendants' motion

14  for summary judgment on Plaintiff's Ralph Civil Rights Act claim.

15      **C. California Civil Code § 52.1**

16      California's Bane Act provides a private cause of action against anyone who

17  "interferes by threats, intimidation, or coercion, or attempts to interfere by threats,

18  intimidation, or coercion, with the exercise or enjoyment by an individual or individuals of

19  rights secured by the Constitution or laws of the United States, or laws and rights secured

20  by the Constitution or laws of California."  Cal. Civil Code § 52.1(a).  Section 52.1 requires

21  "an attempted or completed act of interference with a legal right, accompanied by a form of

22  coercion."  *Jones v. Kmart Corp.*, 17 Cal.4th 329 (1998).  "[U]nder section 52.1, plaintiffs

23  need not allege that defendants acted with discriminatory animus or intent, so long as those

24  acts were accompanied by the requisite threats, intimidation, or coercion."  *Venegas v.*

25  *County of Los Angeles*, 32 Cal. 4th 820, 843 (2004).  "[T]he elements of the excessive force

26  claim under § 52.1 are the same as under § 1983."  *Cameron v. Craig*, 713 F.3d 1012, 1022

27  (9th Cir. 2013).

28  ///

1    Defendants here argue that, to sustain a Bane Act claim past summary judgment,

2   "'[t]he act of interference with a constitutional right must itself be deliberate or spiteful,'" and

3   "'[t]he statute requires a showing of coercion independent from the coercion inherent in the

4   wrongful detention itself.'"  (Mot. at 21 (quoting *Shoyoye v. County of Los Angeles*, 203 Cal.

5   App. 4th 947, 959 (2012).)  In *Shoyoye*, a clerical error resulted in the unlawful detention of

6   a prisoner that had been ordered released, and the California Appeals Court rejected the

7   prisoner's Bane Act claim because "[t]he apparent purpose of the statute is not to provide

8   relief for an overdetention brought about by human error" but rather by "intentional conduct."

9   *Shoyoye*, 203 Cal. App. 4th at 959.  Plaintiffs attempt to distinguish *Shoyoye* on the ground

10   that it should only prevent Bane Act claims based on clerical errors.  (Opp'n Br. at 22-23.)

11   After *Shoyoye* was decided, the same court decided *Bender v. County of Los Angeles*, which

12   noted a wide split among state and federal courts about whether the *Shoyoye* ruling applied

13   to all Bane Act claims.  *Bender v. County of Los Angeles*, 217 Cal. App. 4th 968, 978 (2013).

14   But the *Bender* court avoided resolving the question of whether a Bane Act claim based on

15   excessive force also requires an intentional violation of some right *other* than the underlying

16   constitutional violation, when an arrest is otherwise lawful; this is because the *Bender* court

17   faced an arrest that was both unlawful to begin with (i.e., not based on probable cause), and

18   used excessive force (there, the arresting officer beat the arrestee after handcuffing him).

19   *Id.* at 978.  The *Bender* decision was clear, though, that "not every wrongful detention is a

20   violation of the Bane Act. Nor, some federal cases say, is every case of excessive force in

21   the effectuation of an otherwise lawful arrest a violation of the Bane Act."  *Id.* at 981. The

22   federal cases that *Bender* approved of were those that rejected Bane Act claims based on

23   excessive force during or after arrests that were otherwise lawful, where plaintiffs made no

24   showing of coercion separate from their underlying excessive force claims.  *Id.* at 980 (citing

25   *Luong v. City & County of San Francisco*, No. C11-5661-MEJ, 2012 U.S. Dist. LEXIS 165190

26   ((N.D. Cal., Nov. 19, 2012); *Hunter v. City & County of San Francisco*, No. 11-4911-JSC,

27

28

2012 U.S. Dist. Lexis 146492 (N.D. Cal., Oct. 10, 2012)).[8]  *See also Chaudhry v. City of Los Angeles*, 751 F.3d 1096, 1105 (9th Cir. 2014) (holding that a successful claim for excessive force under the Fourth Amendment provides the basis for, but is not coextensive with, a successful claim under § 52.1).

Here, the parties do not dispute that Officer McCarthy had probable cause to stop Victor, or that the decision to arrest him was lawful.  Plaintiffs have made no showing of coercion separate from their underlying Fourth and Fourteenth Amendment claims.  Though they have raised genuine factual disputes over whether Officer McCarthy used excessive force in effecting Victor's arrest or abused his power in a way that shocks the conscience, they have not shown (nor attempted to show) that Officer McCarthy interfered with Victor's exercise or enjoyment of *separate* rights covered by the Bane Act.  The Court **GRANTS** Defendants' motion for summary judgment on Plaintiffs' Bane Act claim.

### D. Assault and Battery

Defendants also move for summary judgment on Plaintiffs' claim of assault and battery.  Under California law, a plaintiff bringing a battery claim against a law enforcement official has the burden of proving the officer used unreasonable force. *See Edson v. City of Anaheim*, 63 Cal. App. 4th 1269 (1998); *see also Saman v. Robbins*, 173 F.3d 1150, 1157 n.6 (9th Cir. 1999) ("A prima facie case for battery is not established under California law unless the plaintiff proves that an officer used unreasonable force against him to make a lawful arrest or detention.").  California law regards "Section 1983 . . . as the federal counterpart of state battery or wrongful death actions."  *Yount v. City of Sacramento*, 43 Cal. 4th 885, 902 (2008) ("[W]e cannot think of a reason to distinguish between section 1983 and a state tort claim arising from the same alleged misconduct. . . ."); *Susag v. City of Lake Forest*, 94 Cal. App. 4th 1401, 1412-13 (2002) ("[I]t appears unsound to distinguish between section 1983 and state law claims arising from the same alleged misconduct.")

---

[8] The Court declines Plaintiffs' invitation to limit *Shoyoye* only to cases where the constitutional violation was caused by unintentional or clerical error.  *Bender*'s approval of *Luong* and *Hunter* shows that the California Appeals Court would not so drastically limit *Shoyoye* to its facts.

1   Because the Court has already determined that Plaintiffs' excessive force claim

2   survives summary judgment, their assault and battery claim is also viable.  *See Nelson v.*

3   *City of Davis*, 709 F. Supp. 2d 978, 992 (E.D. Cal. 2010), *aff'd*, 685 F.3d 867 (9th Cir. 2012)

4   ("Because the same standards apply to both state law assault and battery and [s]ection 1983

5   claims premised on constitutionally prohibited excessive force, the fact that Plaintiff's 1983

6   claims under the Fourth Amendment survive summary judgment also mandates that the

7   assault and battery claims similarly survive.")  A genuine dispute of material fact remains as

8   to whether Officer McCarthy used unreasonable force.  The Court **DENIES** Defendants'

9   motion for summary judgment on this ground.

10   **E. Wrongful Death**

11   Defendants move for summary judgment on Plaintiffs' wrongful death claim on the

12   grounds that Cal. Gov't Code § 820.2 immunizes public officers like McCarthy from suit for

13   all discretionary acts other than excessive or unreasonable use of force. (Mot. at 23.) Under

14   § 820.2, "a public employee is not liable for an injury resulting from his act or omission where

15   the act or omission was the result of the exercise of the discretion vested in him, whether or

16   not such discretion be abused." Cal. Gov't Code § 820.2. But "a police officer does not have

17   discretionary immunity from liability for the use of unreasonable force in making an arrest."

18   *Scruggs v. Haynes*, 252 Cal. App. 2d 256, 267 (1967).  Because Defendants are not entitled

19   to summary judgment that Defendant McCarthy's acts were reasonable under the

20   circumstances, the Court **DENIES** the motion.

21   **F. Negligence**

22   "[I]n order to prove facts sufficient to support a finding of negligence, a plaintiff must

23   show that [the] defendant had a duty to use due care, that he breached that duty, and that

24   the breach was the proximate or legal cause of the resulting injury."  *Nally v. Grace*

25   *Community Church*, 47 Cal.3d 278, 292 (1988).  As to the "duty" element, peace officers

26   have a duty to act reasonably when using deadly force.  *Munoz v. Olin*, 24 Cal.3d 629, 634

27   (1979).  The reasonableness of an officer's conduct is determined in light of the totality of

28   ///

1   circumstances.  *Grudt v. City of Los Angeles*, 2 Cal. 3d 575 (1970).   According to the

2   California Supreme Court,

3       [l]aw enforcement personnel's tactical conduct and decisions preceding the
        use of deadly force are relevant considerations under California law in
4       determining whether the use of deadly force gives rise to negligence liability.
        Such liability can arise, for example, if the tactical conduct and decisions show,
5       as part of the totality of circumstances, that the use of deadly force was
        unreasonable.

6   *Hayes v. County of San Diego*, 57 Cal. 4th 622, 639 (2013).  For a negligence claim based

7   on an officer's actions preceding the use of deadly force, the pre-shooting conduct must

8   *cause* the victim's death.  *Id.* at 637.  "California has definitively adopted the substantial

9   factor test of the Restatement Second of Torts for cause-in-fact determinations . . . .  Under

10  that standard, a cause in fact is something that is a substantial factor in bringing about the

11  injury."  *Rutherford v. Owens-Illinois, Inc.*, 16 Cal. 4th 953, 968-69 (1997).

12      Defendants move for summary judgment on Plaintiffs' negligence claim on the

13  grounds that Officer McCarthy's actions were reasonable, and that there is no evidence that

14  any unreasonable behavior *caused* Victor's death.  (Mot. at 24; Docket no. 68, Reply Br. at

15  10.)  Specifically, Plaintiffs argue that Officer McCarthy's tactical errors leading up to his

16  confrontation with Victor create a genuine dispute of material fact that he acted unreasonably

17  at some point before his decision to shoot Victor.[9]  (Opp'n Br. at 24-25 (citing *Hayes*, 57 Cal.

18  4th at 629-30).)  But in California, as in most jurisdictions, negligence requires a much higher

19  showing—any unreasonable actions must *cause* the victim's injury or, in this case, death.

20  *Hayes*, 57 Cal. 4th at 637.

21      No reasonable jury could find that Officer McCarthy's pre-shooting negligence caused

22  Victor's death.  Under California law, "the actor's negligent conduct is not a substantial factor

23  in bringing about harm to another if the harm would have been sustained even if the actor

24  had not been negligent."  *Viner v. Sweet*, 30 Cal. 4th 1232, 1240 (2003).  The undisputed

25

26      [9] In their opposition to summary judgment, Plaintiffs abandon all negligence theories
    except the one that McCarthy is negligent based on his pre-shooting conduct.  (Opp'n Br.
27  at 24-25.) .  *Shakur v. Schriro*, 514 F.3d 878, 892 (9th Cir. 2008) ("We have previously held
    that a plaintiff has 'abandoned . . . claims by not raising them in opposition to [the
28  defendant's] motion for summary judgment.'") (quoting *Jenkins v. Cnty. of Riverside*, 398
    F.3d 1093, 1095 n.4 (9th Cir. 2005)) (alteration in original).

1  evidence about McCarthy's pre-shooting conduct is that he responded to Shakina's request

2  for emergency assistance, heard Officer Maynard's report that the suspect was fleeing in a

3  certain direction, began immediate pursuit, caught up to Victor in the narrow breezeway, and

4  attempted to arrest him.  The arrest included his tactical decision to perform a leg-sweep

5  maneuver, as well as his decision to move his secondary weapon further away from Victor

6  after noticing that it was loose.  Even if one or more of these pre-shooting actions may have

7  been unreasonable in light of the circumstances – and the Court does not believe any of

8  them were – there is no evidence that, had McCarthy acted more reasonably in arresting

9  Victor prior to any need for deadly force arising, Victor's death would have been avoided.

10  The Court **GRANTS** summary judgment against Plaintiffs' claim of pre-shooting negligence.

11  **IV.  Ruling on Objections to Evidence**

12       Under Fed. R. Civ. P. 56(c)(2), a party may object as to the admissibility of evidence

13  presented. Defendants have filed extensive objections to the evidence on which Plaintiffs

14  rely in opposing summary judgment (Docket no. 68), to which Plaintiffs filed a response.

15  (Docket no. 80.)  Most of the objections are moot, because the Court does not rely on all the

16  evidence objected to.  The remaining objections were addressed and overruled as they

17  arose.  In no event did Defendants properly object "that the material cited to support or

18  dispute a fact cannot be presented in a form that would be admissible in evidence."  Fed. R.

19  Civ. P. 56(c).  The objections are therefore **OVERRULED**.

20  **V.  Conclusion and Order**

21       For the reasons set forth above, the Court **GRANTS** Defendants' motion for summary

22  judgment on Plaintiffs' § 51.7, § 52.1, and negligence claims.  The Court **DENIES** summary

23  judgment on Plaintiffs' Section 1983, assault and battery, and wrongful death claims.

24       The Court previously vacated the pretrial conference, and now **RESCHEDULES** it for

25  **Monday, February 9, 2015 at 12:00 p.m.**

26       **IT IS SO ORDERED**.

27  DATED:  November 13, 2014

28  **HONORABLE LARRY ALAN BURNS**
    United States District Judge